**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| MONTWAIN CARTER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: _____ |
| v. | **JURY TRIAL DEMANDED** |
| MANAGED CARE OF NORTH AMERICA, INC., MCNA INSURANCE CO., and MCNA HEALTH CARE HOLDINGS, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Montwain Carter ("Plaintiff"), by and through their undersigned counsel, brings this Class Action Complaint against Defendants Managed Care of North America, Inc., MCNA Insurance Company, and MCNA Health Care Holdings, LLC (collectively "MCNA" or "Defendants") individually and on behalf of all others similarly situated, and alleges as follows, based upon personal knowledge as to himself, and upon information and belief as to all other matters.

## INTRODUCTION

1.      MCNA is a Florida-based dental benefits management company founded in 1992. On February 26, 2023, MCNA suffered a serious data breach whereby third-party hackers gained access to and extracted troves of sensitive information maintained on MCNA's servers and demanded a ransom in exchange for not releasing the information (the "Data Breach").

2.      The stolen information included, among other sensitive information, names, addresses, telephone numbers, emails, Social Security numbers, date of birth, driver's license number, health insurance information, information regarding dental/orthodontic care

(collectively "PII") of MCNA's current and former clients and potentially for parents, guardians, or guarantors of patients. After MCNA failed to meet the hacker's demands, this information was posted to a dark web site associated with a well-known ransomware group.

3.    Those individuals impacted by the Data Breach are now at serious risk. Their most sensitive personal and health information is in the possession of cybercriminals seeking to profit from it and is readily available on underground websites for anyone to access. Even MCNA acknowledged the immediate danger affected individuals face, advising them of "steps you can take to monitor and protect your personal information."

4.    Consequently, millions of individuals have suffered or are at an imminent risk of identity theft and fraud, and will face a lifetime of expensive and time-intensive efforts to mitigate the actual and potential impact of the Data Breach, including placing freezes and alerts with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring their financial accounts and credit reports for unauthorized activity.

5.    Defendants are responsible for the breach by failing to implement and maintain reasonable safeguards to protect their customer's information and failing to comply with industry-standard data security practices. Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including but not limited to reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extended credit monitoring services and identity theft insurance, and injunctive relief requiring Defendants to implement and maintain reasonable data security practices going forward.

## PARTIES

6.      Plaintiff Montwain Carter is a current resident and citizen of Davenport, Iowa. Plaintiff receives dental insurance from MCNA.

7.      Defendant MCNA Insurance Company is a dental benefits manager with its principal place of business located at 3100 SW 145th Avenue, Suite #200, Miramar, FL 33027.

8.      Defendant Managed Care of North America, Inc. is a dental benefits manager with its principal place of business located at 200 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309.

9.      Defendant MCNA Health Care Holdings, LLC is the parent of MCNA Insurance Company and Managed Care of North America, Inc. with its principal place of business located at 200 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which at least one member of the class is a citizen of a state different from Defendants, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2) because a substantial part of the events or omissions giving risk to the claim occurred here and Defendants are subject to this Court's personal jurisdiction. Among other things, Defendants are headquartered in this District, Defendants conduct substantial business operations in this District, and Defendants purposely availed themselves to the benefits of the Court's jurisdiction.

## FACTUAL ALLEGATIONS
### *MCNA's Privacy Practices*

12.     MCNA markets itself as a national leader in dental benefits management.

13.     MCNA recognizes the importance of data security: "One of our strengths is our ability to administer dental plans in an effective and innovative manner while safeguarding our members' protected health information. We are committed to complying with the requirements and standards of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). We demonstrate our commitment through our actions." MCNA represents that "we have a responsibility to protect the privacy of your information. We have safeguards in place to protect your information in various ways including … Limiting who may see your information and how we use or disclose your information … Training our employees and associates about company privacy policies and procedures."[1]

14.     MCNA acknowledges its responsibilities for clients' information: "We are required by law to maintain the privacy and security of your protected health information. We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information. ... We will not use or share your information other than as described here unless you tell us we can in writing."[2]

15.     MCNA represents to its provider clients that "[o]ur staff is trained to process your information within all regulatory statutes and maintains all information with the strictest confidence…."[3]

16.     MCNA represents to its provider clients that "MCNA is fully committed to ensuring a clear and easy path to HIPAA readiness well ahead of federally mandated compliance deadlines."[4]

---

[1] https://www.mcna.net/en/privacy (last visited June 13, 2023).

[2] https://www.mcna.net/en/privacy (last visited June 13, 2023).

[3] https://www.mcna.net/en/providers-overview (last visited June 13, 2023).

[4] https://www.mcna.net/en/providers-overview (last visited June 13, 2023).

17. In the course of providing services MCNA collects clients' highly sensitive PII, including Social Security Numbers, dates of birth, and health insurance information. As a result, these clients' highly sensitive PII is stored on MCNA's under-secured internet-accessible network.

18. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, MCNA assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosure.

19. MCNA maintains a privacy policy dated June 2018, that is accessible from its website ("Privacy Policy"). MCNA's Privacy Policy states that "[w]e are required by law to maintain the privacy and security of your protected health information."[5]

20. In this Privacy Policy, MCNA promises to let clients "know promptly if a breach occurs that may have compromised the privacy or security of your information."[6]

21. According to MCNA's Privacy Policy, MCNA is required to "keep your health information private. We have to give you this notice about our privacy practices, our legal duties and your rights."[7] It also provides restrictions on further sharing, "[w]e will not use or share your information other than as described here unless you tell us we can in writing."[8]

22. This Privacy Policy also provides that MCNA may "use or share your information for health research. . . . Share your information with your plan sponsor or permit them to perform plan administration functions such as eligibility, enrollment, and disenrollment activities. We will not share detailed health information with your plan sponsor unless you provide us your

---

[5] https://www.mcna.net/en/providers-overview (last visited June 13, 2023).

[6] https://www.mcna.net/en/providers-overview (last visited June 13, 2023).

[7] https://www.mcna.net/en/providers-overview (last visited June 13, 2023).

[8] https://www.mcna.net/en/providers-overview (last visited June 13, 2023).

permission, or your plan sponsor has certified they agree to maintain the privacy of your information. . . . We will never share your information for marketing purposes, sell your personal health information, or share most uses and disclosure of psychotherapy notes unless you give us written permission."

## THE DATA BREACH

23.    MCNA's breach is the largest healthcare data breach reported in 2023.[9]

24.    Between at least February 26, 2023 and March 7, 2023, a hacker infiltrated MCNA's network and accessed the highly sensitive PII of at least 8.9 million clients stored on its servers, including full names, dates of birth, Social Security numbers, and health insurance information.

25.    MCNA discovered the breach on March 6, 2023, but did not disclose the Data Breach until nearly three months after its discovery, when it began notifying state attorneys general and affected clients on May 26, 2023.

26.    In its notice to state attorneys general, MCNA stated that the breach occurred February 26, 2023 and that MCNA discovered the breach on March 6, 2023.

27.    MCNA described the breach as "an unauthorized third party was able to access certain systems and remove copies of some personal information between February 26, 2023 and March 7, 2023". MCNA stated that hackers acquired the name or other personal identifier in combination with Social Security numbers of over 8.9 million people.[10]

---

[9] https://www.scmagazine.com/news/ransomware/systems-hack-data-theft-8-9m-mcna-dental-patients (last visited June 13, 2023).

[10] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last visited June 13, 2023).

28.     The hackers threatened to release the information exfiltrated from MCNA's network, if ransom was not timely paid.[11]

29.     Despite finally providing notice on May 26, 2023, the notice letter is deficient. MCNA's notice says "we are unaware of any actual or attempted misuse of provider information as a result of this incident. . . ."[12] MCNA so stated while knowing clients' PII was being actively dumped on the dark web, a fact that MCNA's notice letter does not mention.

30.     MCNA's notice letter omits altogether that the group behind the hack is a known ransomware group that threatened to release the information if certain conditions were not met.

31.     MCNA also advised affected individuals to take a number of actions to protect against the threat of harm:

**What You Can Do:**
- Enroll in free credit monitoring
- Carefully review credit reports and statements sent from providers as well as insurance companies
- Report questionable charges
- Order credit reports
- Provide updated personal information to healthcare providers
- Contact the FTC
- Place a fraud alert on credit file
- Security Freezes

---

[11] https://tcrn.ch/3MP6IXg (last visited June 13, 2023).

[12] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56/871548ce-318e-48dd-a3b9-6eec9ef88da9/document.html (last visited June 13, 2023).

32.     MCNA's communication concluded with an acknowledgement of concern and responsibility: "We sincerely regret that this incident occurred and apologize for any inconvenience this incident may cause."[13]

33.     MCNA's notice also discusses actions MCNA claims to have taken in response to the Data Breach, stating, "we promptly launched a forensic investigation, took steps to mitigate and remediate the incident and to help prevent further unauthorized activity, and contacted law enforcement. In response this incident, we have enhanced our security controls and monitoring practices as appropriate, to minimize the risk of any similar incident in the future."[14]

34.     Absent from the notice are any details of how the Data Breach happened or how MCNA's actions have remediated the root cause of the Data Breach.

35.     MCNA has also posted a "Data Privacy Incident" alert on its website.[15] It is unclear when this notice was posted.

36.     In this notice, MCNA recommends that impacted individuals enroll in the free identity theft protection service and "[p]lease check your bills and accounts to be sure they look correct."[16]  This is the exact same type of general and vague advice contained in MCNA's sample notice.

37.     Additionally, MCNA reiterates it is "MCNA takes the security of personal information seriously. As soon as the event was discovered, a forensic investigation was

---

[13] https://apps.web.maine.gov/online/aeviewer/ME/40/6282d559-46ff-434c-9edd-41815a7fcd74/109c5fdc-5f97-4dd7-9382-c600bd3322df/document.html (last visited June 13, 2023).

[14] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56/871548ce-318e-48dd-a3b9-6eec9ef88da9/document.html (last visited June 13, 2023).

[15] https://response.idx.us/MCNA-Information/ (last visited June 13, 2023).

[16] https://response.idx.us/MCNA-Information/ (last visited June 13, 2023).

launched. Law enforcement was contacted. MCNA is also making their computer systems stronger than before so this event does not happen again."[17]

38.     MCNA's only explanation for the nearly three month delay prior to providing notice is that investigations are "very complicated."[18]  The PII of Plaintiffs and Class Members was in the hands of hackers for nearly three months before MCNA attempted to notify affected Class Members. By waiting this long to disclose the Data Breach and by downplaying the risk that victims' PII would be misused by bad actors, MCNA prevented victims from taking meaningful, proactive, and targeted mitigation measures to protect themselves from harm.

39.     This inaction is particularly egregious where, as here, the files have been exfiltrated and are currently in the process of being distributed on the dark web. After MCNA refused to negotiate with the hackers or pay the ransom, the hackers claiming responsibility for the Data Breach, posted all of the stolen data on their extortion site.[19]

### *The Data Breach was Preventable*

40.     Following the Data Breach, MCNA repeatedly stated that it was "enhance[ing]" its systems.[20] For example, in the privacy incident notice letter, MCNA represents that it engaged cybersecurity experts to investigate the incident and "assist with remediation efforts," "took steps to mitigate and remediate the incident and to help prevent further unauthorized activity," and

---

[17] https://response.idx.us/MCNA-Information/ (last visited June 13, 2023).

[18] https://response.idx.us/MCNA-Information/ (last visited June 13, 2023).

[19] https://tcrn.ch/3MP6IXg (last visited June 13, 2023).

[20] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56/871548ce-318e-48dd-a3b9-6eec9ef88da9/document.html (last visited June 13, 2023).

enhanced our security controls and monitoring practices as appropriate."[21] It offers no explanation as to why cyber security experts were not engaged prior to the breach to secure its computer systems, or what specific measures it took to rectify the data breach. And if the Data Breach was so easily contained or remediated, MCNA's failure to prevent the breach is inexcusable given its knowledge that it was a prime target for cyberattacks.

41.     These protective measures should have been implemented long before the Data Breach occurred, especially given that the healthcare industry is among the most targeted sectors for phishing scams and cyberattacks.

42.     Its status as a prime target for cyberattacks was known and obvious to MCNA as it observed frequent public announcements of data breaches affecting various service providers and understood that the type of information MCNA collects, maintains, and stores is highly coveted and a frequent target of hackers. Over 1,800 data breaches occurred in 2022.[22]

43.     This was known and obvious to Defendants as they observed frequent public announcements of data breaches affecting health-related industries and knew that information of the type they collected, maintained, and stored is highly coveted and a frequent target of hackers.

44.     In early 2015, Anthem, Inc., the second-largest health insurer in the United States, suffered a massive data breach exposing the names, addresses, Social Security numbers, dates of

---

[21] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56/871548ce-318e-48dd-a3b9-6eec9ef88da9/document.html (last visited June 13, 2023).

[22] https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited June 13, 2023).

birth, and employment histories of nearly 80 million current and former plan members nationwide.[23]

45.     In March 2015, health insurer Premera Blue Cross announced it suffered a data breach that exposed the medical data and financial information of 11 million customers, including claims data, clinical information, banking account numbers, Social Security numbers, birth dates and other data in a cyberattack that began in May 2014.[24]

46.     In September 2015, New York-based heather insurer Excellus BlueCross BlueShield announced a breach that exposed the PII of 10 million of its plan members in an attack dating back to 2013, including names, dates of birth, Social Security numbers, mailing addresses, telephone numbers, member identification numbers, financial account information and claim information.[25]

47.     In June 2017, U.S.-based pharmaceutical giant Merck, was hit with a massive cyberattack that shut down the company's systems and sought a ransom in exchange for access.[26] Over the coming days, Merck's company-wide e-mail was disabled, 70,000 employees were prohibited from accessing their devices, and the organization suffered a worldwide disruption of

---

[23] C. Riley, *Insurance Giant Anthem Hit by Massive Data Breach*, CNN (Feb. 6, 2015), https://money.cnn.com/2015/02/04/technology/anthem-insurance-hack-data-security/ (last visited June 13, 2023).

[24] *Premera Blue Cross Says Data Breach Exposed Medical Data*, THE NEW YORK TIMES (March 1, 2015), https://www.usatoday.com/story/tech/2015/09/10/cyber-breach-hackers-excellus-blue-cross-blue-shield/72018150/ (last visited June 13, 2023).

[25] *Cyber Breach Hits 10 Million Excellus Healthcare Customers*, USA TODAY (Sept. 10, 2015), https://www.usatoday.com/story/tech/2015/09/10/cyber-breach-hackers-excellus-blue-cross-blue-shield/72018150/ (last visited June 13, 2023).

[26] H. Shaban, *et al.*, *Pharmaceutical giant rocked by ransomware attack*, THE WASHINGTON POST (June 27, 2017), https://www.washingtonpost.com/news/the-switch/wp/2017/06/27/pharmaceutical-giant-rocked-by-ransomware-attack/ (last visited June 13, 2023).

its operations which forced a halt on the production of new drugs.[27] Due to a production shutdown caused by the attack, Merck experienced hundreds of millions of dollars in sales reductions and the attack reportedly cost Merck $1.3 billion in total losses.[28]

48.    In April 2019, it was announced that German pharmaceutical giant Bayer was the target of an attempted cyberattack when the company discovered malware on its network in early 2018 and then isolated and monitored it over the coming months to track its source. Bayer's ability to contain the threat prevented a potential system-wide takeover that could have resulted in significant data loss and extensive operational disruption.[29]

49.    In July 2019, Roche AG, a Swiss multinational healthcare and pharmaceutical company, acknowledged that it had been the target of a cyberattack that, like Bayer, involved a type of malware that allows hackers to remotely access the company's computer network.[30] Like Bayer, Roche was able to identify and contain the threat. According to a Roche spokesperson, "Roche has been targeted by various attackers in the past, including the group known as Winnti.

---

[27] M. Erman, *et al.*, *Merck says cyber attack halted production, will hurt profits*, REUTERS (July 28, 2017), https://www.reuters.com/article/us-merck-co-results/merck-says-cyber-attack-halted-production-will-hurt-profits-idUSKBN1AD1AO (last visited June 13, 2023).

[28] D. Voreacos, *et al.*, *Merck Cyberattack's $1.3 Billion Question: Was It an Act of War?*, BLOOMBERG (Dec. 2, 2019), https://www.bloomberg.com/news/features/2019-12-03/merck-cyberattack-s-1-3-billion-question-was-it-an-act-of-war (last visited June 13, 2023).

[29] P. Weiss, *et al.*, *Bayer contains cyber attack it says bore Chinese hallmarks*, REUTERS (Apr. 4, 2019), https://www.reuters.com/article/us-bayer-cyber/bayer-says-has-detected-contained-cyber-attack-idUSKCN1RG0NN (last visited June 13, 2023).

[30] A. Schuetze, *et al.*, *BASF, Siemens, Henkel, Roche target of cyber attacks*, REUTERS (July 24, 2019), https://www.reuters.com/article/us-germany-cyber/basf-siemens-henkel-roche-target-of-cyber-attacks-idUSKCN1UJ147 (last visited June 13, 2023).

These attacks were detected and remediated. Roche hasn't lost any sensitive personal data of our employees, patients, customers or business partners."[31]

50.     In addition to these cyberattacks targeting the healthcare and pharmaceutical industries, among hundreds of others, Defendants also observed numerous other well-publicized data breaches involving major corporations that were targeted given the sensitive consumer information they retained. For example, through a series of data breaches extending back to 2013, more than three billion Yahoo! user accounts were compromised when users' names, addresses, and dates of birth were stolen as part of a multi-faceted cyberattack.[32]

51.     In separate incidents in 2013 and 2014, hundreds of millions of retail customers were victimized by hacks of payment card systems at Target and the Home Depot. Both breaches led to rampant payment card fraud and other damages both to consumers and to the card-issuing banks.[33]

52.     In September 2017, credit reporting agency Equifax announced that hackers stole the personal and financial information of 147 million Americans between May and July 2017.[34]

---

[31] E. Palmer, *Roche, like Bayer, was hit in Winnti cyberattack*, FIERCE PHARMA (July 24, 2019), https://www.fiercepharma.com/manufacturing/roche-like-bayer-was-targeted-winnti-cyber-attack (last visited June 13, 2023).

[32] S. Larson, *Every Single Yahoo Account was Hacked – 3 Billion in All*, CNN (OCT. 4, 2017), https://money.cnn.com/2017/10/03/technology/business/yahoo-breach-3-billion-accounts/index.html (last visited June 13, 2023).

[33] B. Krebs, *Home Depot Hit By Same Malware as Target*, KREBS ON SECURITY (Sept. 14, 2014), https://krebsonsecurity.com/tag/home-depot-databreach/ (last visited June 13, 2023).

[34] Equifax Press Release, *Equifax 2017 Cybersecurity Incident & Important Consumer Information*, https://www.equifaxsecurity2017.com/frequently-asked-questions/ (last visited June 13, 2023).

The following year, hotel giant Marriott announced that 383 million guest records were exfiltrated from its hotel guest reservation database over a four-year period.[35]

53.     Despite being a holder of highly-sensitive PII, MCNA failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access on its network. Defendants had the resources to prevent a breach and made significant expenditures to promote their business operations, but neglected to adequately invest in data security, despite the growing number of well-publicized data breaches affecting healthcare related industries. Had MCNA implemented adequate security measures, hackers never could have accessed the PII of over 8.9 million clients and the Data Breach would have been prevented or much smaller in scope.

### *Allegations Relating to Plaintiff*

54.     MCNA obtained Plaintiff's PII including Social Security number in order to provide healthcare services.

55.     On or about June 10, 2023, Plaintiff received a notification letter from MCNA stating that he was a victim of the Data Breach.

56.     The letter recommended that Plaintiff take certain actions like monitoring his accounts and "carefully review[ing] credit reports and statements sent from providers as well as your insurance company to ensure that all account activity is valid."

57.     Despite instructing Plaintiff to "monitor and protect" his personal information, Defendants themselves were not vigilant against the risks of a data breach.

---

[35] Marriott Press Release, *Marriott Provides Update on Starwood Database Security Incident*, https://news.marriott.com/2019/01/marriott-provides-update-on-starwood-database-security-incident/ (last visited June 13, 2023).

58.     To protect himself from additional harm, Plaintiff has been and will continue to be forced to spend significant time and effort engaging in remedial efforts to protect his information from additional attacks. Plaintiff must now continue to spend time and effort reviewing his financial and other account statements for evidence of unauthorized activity which he will continue to do indefinitely. Plaintiff suffered significant distress knowing his highly personal information is no longer confidential and their accounts are being targeted. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

59.     Upon information and belief, MCNA continues to store and/or share Plaintiff's PII on its internal systems. Thus, Plaintiff has a continuing interest in ensuring that his PII is protected and safeguarded from future breaches.

### *Defendants Failed to Comply with Regulatory Guidance*

60.     Federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[36]

61.     The FTC's publication, Protecting Personal Information: A Guide for Business, sets forth fundamental data security principles and practices for businesses to implement and

---

[36] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 13, 2023).

follow as a means to protect sensitive data.[37] Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[38]

62.   Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[39] This is consistent with guidance provided by the FBI.

63.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade

---

[37] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 13, 2023).

[38] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 13, 2023)

[39] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 13, 2023).

Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[40]

64.     In this case, Defendants were fully aware of their obligation to use reasonable measures to protect the PII of its clients. Defendants also knew they were targets for hackers. But despite understanding the consequences of inadequate data security, MCNA failed to protect its highly-sensitive data.

65.     Defendants failure to employ reasonable and appropriate measures to protect against unauthorized access to members' information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *The Effect of the Data Breach on Affected Individuals*

66.     MCNA's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, date of birth, health insurance information, and Social Security numbers—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

67.     The PII exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use consumers' PII to open new financial accounts, open new

---

[40] https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited June 13, 2023).

utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."[41]

68.      Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be the victims of several cybercrimes stemming from a single data breach.

69.      Victims of the Data Breach face significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare statements, checking credit reports, and spending time and effort searching for and responding to unauthorized activity.

70.      It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[42]

---

[41] A criminal combines real and fake information to create a new "synthetic" identity, which is used to commit fraud.

71.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[43]

72.     The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[44]

73.     Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes.

---

[42] https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited June 13, 2023).

[43] https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited June 13, 2023).

[44] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

74.     As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

   a. the unconsented disclosure of confidential information to a third party;

   b. losing the inherent value of their PII;

   c. losing the value of access to their PII permitted by MCNA;

   d. losing the value of the explicit and implicit promises of data security;

   e. identity theft and fraud resulting from the theft of their PII;

   f. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

   g. anxiety, emotional distress, and loss of privacy;

   h. the present value of ongoing credit monitoring and identity theft protection services necessitated by MCNA's Data Breach;

   i. unauthorized charges and loss of use of and access to their accounts;

   j. lowered credit scores resulting from credit inquiries following fraudulent activities;

   k. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

75.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

76.     There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[45]

77.     Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[46]

78.     Plaintiff and Class Members have a direct interest in MCNA's promises and duties to protect their PII, i.e., that MCNA not increase their risk of identity theft and fraud.

---

[45] https://www.gao.gov/assets/gao-07-737.pdf (last visited June 13, 2023).

[46] https://web.archive.org/web/20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited June 13, 2023).

Because MCNA failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by MCNA's wrongful conduct. Through this remedy, Plaintiff seeks to restore themselves and Class Members as close to the same position as they would have occupied but for MCNA's wrongful conduct, namely its failure to adequately protect Plaintiff's and Class Members' PII.

79.     Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through MCNA's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

80.     MCNA's delayed notice letter also caused Plaintiff and Class Members harm. Furthermore, the letter did not explain the precise nature of the attack, the identity of the hackers,

or the number of individuals affected. MCNA's decision to withhold these key facts is significant because affected individuals may take different precautions depending on the severity and imminence of the perceived risk. By waiting over a month to disclose the Data Breach and by downplaying the risk of misuse, MCNA prevented victims from taking meaningful, proactive, and targeted mitigation measures to secure their PII and accounts.

81.     Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft because MCNA continues to hold their PII.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff seeks relief individually and as a representative of all others who are similarly situated. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), Plaintiff seeks certification of a nationwide class defined as follows:

83.     All U.S. persons whose PII was compromised as a result of the data breach announced by MCNA on or about May 26, 2023 (the "Class").

84.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, employees, legal representatives, successors, subsidiaries, and assigns. Also excluded are all persons who make a timely election to be excluded from the Class and any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

85.     **Ascertainability.** The members of the Class are readily identifiable and ascertainable. MCNA and/or its affiliates, among others, possess the information to identify and contact Class Members.

86.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** The members of the Class are so numerous that joinder of all of them is impracticable. MCNA's statements reveal that the Class contains approximately 8.9 million individuals whose PII was compromised in the Data Breach.

87.    **Commonality. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include, but are not limited to:

a.    Whether MCNA owes Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their PII;

b.    Whether MCNA acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' PII;

c.    Whether MCNA violated its duty to implement reasonable security systems to protect Plaintiff's and Class Members' PII;

d.    Whether MCNA's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

e.    Whether MCNA provided timely notice of the Data Breach to Plaintiff and Class Members; and

f.    Whether Plaintiff and Class Members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

88.    MCNA has engaged in a common course of conduct and Plaintiff and Class Members have been similarly impacted by MCNA's failure to maintain reasonable security procedures and practices to protect customer's PII, as well as MCNA's failure to timely alert affected clients of the Data Breach.

89.    **Typicality. Fed. R. Civ. P. 23(a)(3).** As to the Class, Plaintiff's claims are typical of the claims of the members because all Class Members had their PII compromised in the Data Breach and were harmed as a result.

90.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and

their interests are aligned with Class Members' interests. Plaintiff was subject to the same Data Breach as Class Members, suffered similar harms, and faces similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including data breach cases.

91.    **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

92.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

93.    Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

      a.      Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, and safeguarding their PII;

      b.      Whether Defendants failed to take reasonable steps to safeguard the PII of Plaintiff and Class Members;

c.　Whether Defendants failed to adequately monitor and the data security systems of MCNA.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class against Defendants)**

94.　Plaintiff restates and re-alleges the preceding paragraphs as if fully set forth herein.

95.　Defendants owed a duty to Plaintiff and members of the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting the PII they collected from MCNA's clients from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing MCNA's security systems to ensure that the PII in MCNA's possession was adequately secured and protected.

96.　Defendants owed a duty of care to Plaintiff and members of the Class to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected the PII of their current and former clients.

97.　Defendants had a special relationship with Plaintiff and Class Members. Plaintiff and Class Members' willingness to entrust Defendants with their PII as a condition of treatment was predicated on the understanding that Defendants would take adequate security precautions to protect their PII.

98.　Defendants owed a duty of care to Plaintiff and members of the Class because they were foreseeable and probable victims of inadequate security practices. Defendants knew or should have known they were targets of cyberattacks and the critical importance of adequately securing their clients' PII.

99.     Plaintiff and members of the Class entrusted Defendants with their PII with the understanding that Defendants would safeguard their information.

100.     Defendants' conduct also created a foreseeable risk of harm to Plaintiff and members of the Class by failing to: (1) secure MCNA's systems and exercise adequate oversight of MCNA's data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

101.     Defendants knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of MCNA's systems, and the importance of adequate security. Defendants were aware of numerous, well-publicized data breaches within the pharmaceutical and healthcare industries in the months and years preceding the Data Breach.

102.     Defendants' duties to use reasonable care in protecting PII also arise from common law and statutes and regulations such as the FTC Act, as well as their own promises regarding privacy and data security.

103.     Defendants breached their common law duty to act with reasonable care in collecting and storing the PII of their clients, which exists independently from any contractual obligations between the parties. Specifically, MCNA breached its common law, statutory, and other duties to Plaintiff and Class Members in numerous ways, including by:

        a.     failing to adopt reasonable data security measures, practices, and protocols;

        b.     failing to implement data security systems, practices, and protocols sufficient to protect Plaintiff and Class Members' PII;

        c.     storing former clients' PII longer than reasonably necessary;

        d.     failing to comply with industry-standard data security measures; and

        e.     failing to timely disclose critical information regarding the nature of the Data Breach.

27

104.     MCNA's failure to implement and maintain adequate data security measures to protect the PII of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiff and members of the Class did not contribute to the Data Breach or the subsequent misuse of their PII as described herein.

105.     It was also foreseeable that MCNA's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

106.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have and will suffer damages including, but not limited to: (i) the loss of value of their PII and loss of opportunity to determine for themselves how their PII is used; (ii) the publication and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as MCNA fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by MCNA's data breach; (x) the value of the unauthorized access to their PII permitted by Defendants; and (xi) any nominal damages that may be awarded.

<u>**COUNT II**</u>
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class against Defendants)**

107.    Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 104.

108.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as MCNA, of failing to use reasonable measures to protect PII. 15 U.S.C. § 45(a)(1).

109.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff and Class Members' PII and by failing to comply with applicable industry standards. Defendants' conduct was particularly unreasonable given the sensitive nature of the PII they obtained and stored.

110.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

111.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

112.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

113.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class against Defendants)**

114.    Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint, and asserts this claim in the alternative to their breach of contract claim against MCNA to the extent necessary.

115.    As a condition of their receiving healthcare from Defendants, Plaintiff and members of the Class were required to provide their PII to Defendants.

116.    Implicit in the agreement between Defendants and their clients was the obligation that Defendants would implement and maintain reasonable safeguards to protect clients' information and comply with industry-standard data security practices.

117.    Additionally, Defendants implicitly promised and agreed to retain this PII only under conditions that kept such information secure and confidential and only as long as reasonably necessary to perform essential business functions. As such, Defendants had a duty to reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or access.

118.    Defendants breached their implied agreement with Plaintiff and members of the Class by failing take appropriate measures to protect the confidentiality and security of their personal data, resulting in the Data Breach.

119.    As a direct and proximate result of Defendants' breach, Plaintiff and members of the Class suffered injury and sustained actual losses and damages as described herein.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

120.     Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint, as if fully set forth herein.

121.     As a healthcare insurance provider, MCNA occupied a position of advisor or counselor to its clients such that MCNA would reasonably inspire confidence that it would act in good faith and in the best interest of its clients. Accordingly, a fiduciary relationship exists between MCNA and its clients, including Plaintiff and Class Members.

122.     By failing to implement and maintain reasonable safeguards to protect their clients' PII, failing to comply with industry-standard data security practices, failing to disclose critical information regarding the nature of the Data Breach, and allowing a third-party hacker to release their PII on the dark web, MCNA intentionally or negligently failed to act in good faith and solely for the benefit of Plaintiff and Class Members.

123.     MCNA's failure to act solely for the benefit of Plaintiff and Class Members was a real and meaningful factor in bringing about their injuries.

124.     As a direct and proximate result of MCNA's breach of fiduciary duty, Plaintiff and Class Members suffered injury and sustained actual losses and damages as described herein.

## COUNT V
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiff and the Class)

125.     Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint, as if fully set forth herein.

126.     As a condition of receiving healthcare, Plaintiff and Class Members were required to provide their PII to MCNA. Such information was highly-personal, sensitive, and not generally known.

127.     MCNA expressly and implicitly agreed to protect the confidentiality and security of the PII it collected, stored, and maintained.

128.     MCNA disclosed the PII to unauthorized third parties by failing to implement and maintain reasonable safeguards to protect its clients' PII and failing to comply with industry-standard data security practices.

129.     As a direct and proximate result of MCNA's breach of confidence, Plaintiff and Class Members suffered injury and sustained actual losses and damages as described herein.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

130.     Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint, as if set forth herein.

131.     Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, used by, and maintained by MCNA and that was ultimately stolen in the MCNA data breach.

132.     MCNA benefitted by the conferral upon it of the PII pertaining to Plaintiff and the Class Members and by its ability to retain, use, and profit from that information. MCNA understood and valued this benefit.

133.     MCNA also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon MCNA maintaining the privacy and confidentiality of that PII.

134.     Without MCNA's willingness and commitment to maintain the privacy and confidentiality of the PII, that PII would not have been transferred to and entrusted to MCNA.

135.     Because of MCNA's use of Plaintiff's and Class Members' PII, MCNA sold more services and products than it otherwise would have. MCNA was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create to the detriment of Plaintiff and Class Members.

136.     MCNA also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Member's PII.

137.     MCNA also benefited through its unjust conduct in the form of the profits it gained through the use of Plaintiff's and Class Members' PII.

138.     It is inequitable for MCNA to retain these benefits.

139.     As a result of MCNA's wrongful conduct as alleged in this Complaint (including among other things its failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that PII), MCNA has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

140.     MCNA's unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members' sensitive PII, while at the same time failing to maintain the information secure from intrusion and theft by hackers and identity thieves.

141.     It is inequitable, unfair, and unjust for MCNA to retain these wrongfully obtained benefits. MCNA's retention of wrongfully obtained monies violates fundamental principles of justice, equity, and good conscience.

142.     The benefit conferred upon, received, and enjoyed by MCNA was not conferred gratuitously, and it would be inequitable, unfair, and unjust for MCNA to retain the benefit.

143.     MCNA's defective security and its unfair and deceptive conduct have, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their PII and has caused the Plaintiff and Class Members other damages as described herein.

144.     Plaintiff and Class Members have no adequate remedy at law.

145.     MCNA is therefore liable to Plaintiff and Class Members for restitution or disgorgement in the amount of the benefit conferred on MCNA as a result of its wrongful conduct, including specifically: the value to MCNA of the PII that was stolen in the Data Breach; the profits MCNA received and is receiving form the use of that information; the amounts that MCNA overcharged Plaintiff and Class Members for use of MCNA's products and services; and the amounts that MCNA should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PII.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

146.     Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint, as if fully set forth herein.

147.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the state and federal statutes described in this Complaint.

148.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further cyberattacks and data breaches that compromise their PII.

149.    Defendants still possess PII pertaining to Plaintiff and Class Members, which means their PII remains at risk of further breaches because Defendants' data security measures remain inadequate. Plaintiff continues to suffer injuries as a result of the compromise of their PII and remains at an imminent risk that further compromises of their PII will occur in the future.

150.    Pursuant to the Declaratory Judgment Act, Plaintiff seeks a declaration that: (a) Defendants' existing data security measures do not comply with their obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) MCNA must have policies and procedures in place to ensure the subsidiaries with whom it shares sensitive PII maintain reasonable, industry-standard security measures, including, but not limited to, those listed at (ii), (a)-(i), *infra*, and must comply with those policies and procedures; (2) MCNA must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiff's and Class Members' PII if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

    a.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration

tests, and audits on MCNA's systems on a periodic basis, and ordering MCNA to promptly correct any problems or issues detected by such third-party security auditors;

b. engaging third-party security auditors and internal personnel to run automated security monitoring;

c. auditing, testing, and training its security personnel regarding any new or modified procedures;

d. encrypting PII and segmenting PII by, among other things, creating firewalls and access controls so that if one area of MCNA's systems is compromised, hackers cannot gain access to other portions of MCNA's systems;

e. purging, deleting, and destroying in a reasonable and secure manner PII not necessary to perform essential business functions;

f. conducting regular database scanning and security checks;

g. conducting regular employee education regarding best security practices;

h. implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

A. For an Order certifying the Class, as defined herein, and appointing Plaintiff as the class representative and the undersigned counsel as class counsel;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Member's PII;

C. For equitable relief compelling Defendants to use industry-standard security methods and policies with respect to data collection, storage and protection, and sharing of information, and to dispose of Plaintiff's and Class Members' PII in their possession that is not necessary to perform essential business functions;

D. For an award of damages, including nominal and statutory damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a jury trial on all claims so triable.

Date: June 15, 2023

Respectfully submitted,

/s/ John A. Yanchunis _____
John A. Yanchunis, Florida Bar No. 324681
Patrick A. Barthle, II, Florida Bar No. 99286
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
jyanchunis@forthepeople.com
pbarthle@forthepeople.com


Norman E. Siegel (pro hac vice
forthcoming)
Barrett J. Vahle (pro hac vice forthcoming)
J. Austin Moore (pro hac vice forthcoming)
Tanner J. Edwards (pro hac vice
forthcoming)
Brandi S. Spates (pro hac vice forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
moore@stuevesiegel.com
tanner@stueveisegel.com
spates@stuevesiegel.com

Daniel Srourian (pro hac vice forthcoming)
**SROURIAN LAW FIRM, P.C**.
3435 Wilshire Blvd, Suite 1710
Los Angeles, California 90010
Telephone: (213) 474-3800
daniel@slfla.com

**ATTORNEYS FOR PLAINTIFF AND
THE PROPOSED CLASSES**